### ISAAC DUNCAN v. THOMPSON H. McMAHAN.

Where cotton is sold for a certain price, to be delivered in future, and the price is not paid in advance, and the seller hauls the cotton to market, and sells it to another person, the first purchaser is entitled to recover from the seller, at least the excess of the price which he received for the cotton above what the first purchaser was to pay him, less the reasonable cost of hauling the cotton to market.

See this case as to a contract for the sale of certain cotton, at a certain price, to be shipped by the seller to the purchaser on the first boat down the river, whether part of the price is paid or not, and no boat descends the river.

Quere, whether the question of reasonable time within which a contract shall be performed, is a question of law, or a mixed question of law and fact.

Appeal from Austin. Tried below before the Hon, James H. Bell.

Suit by appellee against appellant. The petition alleged : That on or about the first day of January, 1855, said Duncan sold to your petitioner forty-four bales of cotton for five and

three-fourth cents per pound, to be delivered to your petitioner on the plantation of said Duncan in said county of Austin; that, by the contract, said Duncan was to ship said cotton on the first boat down the Brasos river ; but, the said river not rising during the time that a rise in the same was anticipated by the parties to said contract, petitioner sent up about the last of March, 1855, to said county of Austin and hired wagons to haul said cotton to Houston, which wagons, petitioner verily believes, hauled off said cotton to Houston. Petitioner, trusting to the honor and honesty of said Duncan, did not at that time pay any further attention to said cotton, supposing that the same would be forwarded to Houston on said wagons, and would be there deposited, subject to petitioner's order ; but in this he was mistaken, for, cotton having risen and the price of the same being much greater than at the time of said sale to your petitioner, said Duncan, being induced to cheat and defraud petitioner, disregarded his said contract, and, instead of hauling, or having said cotton hauled off for the use and benefit of petitioner, hauled it off to said town of Houston for his own private use, benefit and behoof, and sold the same in said town, on or about the 1st of April, 1855, for eight cents per pound, and converted the money, arising from said sale, then and there to his own use.

Petitioner further shows that part of the purchase money was paid to said Duncan at the time said sale of cotton was made to petitioner by him, to-wit : in said Duncan's account with the firm of T. H. McMahan & Co., which petitioner then and there, to-wit : in the town of Richmond, at the special instance and request of said Duncan, assumed to pay for said Duncan, and did pay ; which said account amounted to the sum of one hundred dollars and more ; and the balance of the purchase money, according to the contract between said Duncan and petitioner, was to be paid so soon as petitioner removed, or caused to be removed, said cotton from the said plantation of the said Duncan. And said Duncan agreed and

bound himself to take also, in part payment of said cotton, any claim (which did not exceed the amount of petitioner's indebtedness to him, after said purchase of cotton) upon B. Little & Co., of San Felipe, in said county of Austin, the said Duncan saying that he was indebted to that firm, and that a claim upon them would be as good as money to him. Petitioner therefore, in persuance of said contract, on or about the thirtieth of March, 1855, purchased a note of hand upon said firm of B, Little & Co., for the sum of three hundred and eighty dollars, and by his agent Walter Andrews, then at the plantation of the said Duncan, tendered to him in part payment of said purchase money for said cotton, said note, which, as petitioner alleges, did not exceed the amount as aforesaid of petitioner's said indebtedness to said Duncan, after the sale of said cotton to petitioner as aforesaid (that is, providing that said contract of sale was not violated by said Duncan,) but the said Duncan, without assigning any good and sufficient reason, and intending, as he did, to violate his contract and defraud petitioner, refused to take said note. Petitioner further sheweth that, at the time said Duncan sold said cotton and converted the same to his own use, it was reasonably worth eleven cents per pound in said town of Houston, and that cotton of the same quality as that was then and there selling for that price; and petitioner further shows that said forty-four bales of cotton, averaged five hundred pounds per bale. He further shows that he was damaged by said breach of contract in the sum of one thousand and five hundred dollars. Petitioner further shows that the first of April, 1855, is the time at which said cotton should have been delivered to him, and that the same was worth on said plantation then the sum of eleven cents per lb. Petitioner further prays, &c.

The petition was afterwards amended by allegation as follows: That the balance of the purchase money on said cotton was to be paid by plaintiff to defendant, after the return of the sale of said cotton had been received by plaintiffs, after a

sale of the same by said plaintiff. And for further amendment plaintiff says that the highest market value of said cotton, between the tenth day of April, 1855, and the fifth of November, 1855, was twelve cents per pound, at the plantation of said Duncan, and that the said tenth day of April was a reasonable time, at which said cotton should have been delivered to plaintiff. And for further amendment plaintiff says that on or about the said tenth of April, said defendant sent off said cotton and sold it in Houston for twelve cents per pound, and converted the money to his own use, with intent to cheat and defraud plaintiff.

The defendant answered by general demurrer, and for special cause assigned :

1st. There is no contract set forth and described in plaintiff's petition with sufficient certainty to enable the defendant to make a proper defence.

2d. The contract was mutual and dependent, as set forth in plaintiff's petition ; and plaintiff no where alleges that he complied with his part of the contract, or offered so to comply, as to make the defendant liable.

Defendant answered further as follows : And for further answer the defendant admits that he did agree to sell the plaintiff about forty bales of cotton upon condition that plaintiff should pay for the same and receive the same before the first day of April, 1855, but denies that the plaintiff complied or offered to comply with his contract. He denies that plaintiff advanced or paid any sum upon said contract, as alleged in his petition ; and denies all and singular the allegations in plaintiff's petition mentioned. This answer was filed before the amendment of the petition.

The answer was afterwards amended by allegation as follows :

That the store account referred to by plaintiff in his petition, was paid in cash by defendant to T. H. McMahan & Co., as per receipt marked exhibit " A," herewith filed, and that,

the money thus paid was a full extinguishment of all debts and demands of the said plaintiff against the defendant.

The evidence was as follows : Deposition of Walter Andrews, witness for plaintiff. I have visited the defendant since the 1st January, 1855, on business for plaintiff, as agent. The first of such visits was sometime near the 1st March, 1855, which was for the purpose of delivering to defendant, for plaintiff, a note on B. Little & Co. in part payment, as I understood, for cotton purchased by plaintiff of defendant. Defendant not being able to use the note as money, sent it back to the plaintiff. The second visit was between the 3d and 10th of April, 1855, for the purpose of engaging wagoners to haul said cotton to Houston. Defendant said he had sold the cotton to plaintiff, and thought that plaintiff would make something on it, but that he would stick to it, and that the trade was made. The number of bales was forty odd ; the weight, price, &c., I do not now remember. I went to the gin-house in company with defendant, for the purpose of seeing the condition of the cotton, and sampled several bales. Defendant was anxious to know why I did it ; said that, if the cotton was yet to be sampled before the trade was confirmed, it was no trade at all, and that he would sell it to some one else. I told him that he might rest assured that McMahan considered himself bound by the trade and was ready to fulfill his part of it, and that the sampling had nothing to do with the contract, and that McMahan would probably never see the samples. After this, defendant appeared to be satisfied : and we went in company to San Felipe to engage wagons to haul the cotton to Houston ; he offered his services to assist in getting teams; he being better acquainted than I, I left it principally to him to engage the teams, he saying that he knew of several that were in the habit of hauling, whom he could engage. It is about six miles from Duncan's residence to San Felipe. After we reached that place for the purpose of engaging wagons, he spoke of the weighing of the cotton, as the purchaser had never got the weights of

the same. Duncan insisted on my returning with him to his house and weighing the cotton; I told him it was impossible for me to turn back, as I was on my way to Columbus, and had important business there to attend to, and had to get there that night; that I would be in Richmond in four or five days, and that I would speak to McMahan in regard to the weighing the cotton; that if McMahan wanted it weighed, some one would be at Duncan's house, within one week to attend to it. When I reached Richmond, I told McM. of the conversation with Duncan. I afterwards met Duncan and he told me he had sold the cotton in Houston; he told me what he got for it; I do not now remember how much; but at all events he had made something on the sale, over the one he had made to McMahan. I went to Duncan's house as agent of McMahan in the cotton trade. I considered the cotton bought by McM. from him, already delivered to McM., as it was understood that Duncan was to have shipped it by the first boat down. This much I learned from both parties, at times subsequent to the trade, of which I was not a witness. There were forty-odd bales. After leaving Duncan at San Felipe, I employed a German, named Myers, who thought he could start three wagons in a few days, with the cotton to Houston. Duncan told me, when conversing with him between the 3d and 10th of April, 1855, that he thought, when the trade was made, that the cotton would have been sold before that time, and that McMahan would have been able to pay him for it by the 1st of April. He said he could not claim the purchase money from McMahan then, as the cotton had not been shipped, but intimated, or rather inquired of me if he could get enough from McMahan to buy a negro girl. I told him McM would give him a draft at any time that he wanted it, as the cotton was about to be shipped, and that a short time would make no difference to McM. I told McM. of Duncan's wants, and he wrote immediately to him that he could have what money he wanted, but, as times were hard, not to call on him until he actually wanted

it. I have stated all that passed between Duncan and myself in relation to the cotton.

Deposition of A. M. Thompson, a witness for plaintiff : Had a conversation with defendant about a sale of cotton to plaintiff this year ; he told me that he had sold his cotton to McMahan, and, in a subsequent conversation, told me that he had sold the same cotton to John Dickenson of Houston. He told me what each one gave him for it, but I do not now remember ; I think the last price was larger than the first.

Deposition of George W. McMahan, a witness for plaintiff : There was a contract of the character described, between plaintiff and defendant, made on or about 12th day of February, 1855, involving a sale of some forty-four or five bales of cotton, at about 6, or perhaps, 5¾ cents per pound. I am not now positive as to the price, but know it was near six cents. The cotton was to be shipped by defendant on the first steamer coming down the river, after the sale, and bill of lading sent to plaintiff, or delivered to his order. The precise time of delivery therefor could not be defined. The quality of the cotton I think was strict middling or good middling. There was at the time of said sale or contract, some advances made to defendant, the precise amount of which I am not prepared to state, neither as to the character of said advance, or the manner in which the balance of the purchase money was to be paid. I know that the balance of the purchase money was to be paid after the delivery or shipment of the cotton, how long, I do not recollect. I do not recollect the price of cotton about the 1st January ; having referred to my books, however, I find entries there the date of this sale, and presume the price indicated in my answer to interrogatory first, was about the market price for that quality of cotton at that time on the Brazos river. (Exceptions to the admission of this testimony.) I of course could not ascertain the possible market value of said cotton at the time it should have been delivered, unless the precise time of delivery could be ascertained. In the month

of April the same article was worth, or selling in the market at from 8 to 8½ cents per pound. The highest market price at any period since that time, delivered at defendant's place of residence was, I should think, about nine cents.

· J. H. Catlin, a witness for plaintiff, testified that the ordinary size of a bale of cotton was about 500 lbs., and that the difference in value of inferior and strict middling cotton, these being the extremes in Texas classification, is ordinarily about four cents in the Houston or Galveston market.

The defendant then introduced the receipt of T. H. McMahan & Co., by their agent, showing that he paid them $115 05, in full of his account to date, April 25th, 1855 ; and the doposition of John Dickenson, of Houston, as follows :

About the month of April last I purchased from the defendant, Isaac Duncan, some 39 bales of cotton, in all about twenty thousand pounds, mostly of inferior quality, for which I paid him about seven and a quarter cents per pound. Cotton of the quality mentioned was, at the time, worth in Houston from 7 to 7¼ cents, and about from 6 to 6¼ cents on the Brazos in Austin county.

Defendant then read the deposition of Walter Andrews, taken in answer to interrogatories propounded by him, as follows :

I do not know the precise date of the contract ; I never saw a written contract between the parties in regard to the cotton. I learned from plaintiff and defendant that the cotton was to be shipped on the first steamer coming down the Brazos. When it was delivered to the boat, it was to be weighed by Duncan. I learned this from the parties separately, subsequent to the contract between them. Duncan was to be paid for his cotton when McMahan received returns of the same, after it had been sold. So far as I know McMahan complied with his part of the contract ; he did not make a demand for the cotton, as far as I know, up to about the 1st of April. The condition of the river was such that, in compliance with the

provisions of the contract, (as far as I learned from the parties, the nature of the contract,) the demand could not have been made, the river not being in boating condition. I called on the defendant with a letter from T. H. McMahan, as his agent. The letter related to the cotton that McMahan had bought from Duncan, as I believe ; the exact contents of the letter and its date, I do not remember. The time at which I took the letter to Duncan was some weeks previous to the Spring Term of the District Court of Colorado County, A. D., 1855. At the time I took the letter to Duncan. it is probable I might have known the exact contents of it, but I do not now remember them. He did offer to weigh the cotton to me when we were at San Felipe, some six miles from his house ; after I had left his house where he had been conversing about the cotton. Being on my road to Colorado county I told him I had important business in Columbus, which was the reason that I could not go back with him. I told him I would go on to Colorado, and from thence to Richmond, and that I would inform McMahan, that he Duncan, wanted the cotton weighed, and that McMahan would have some one at Duncan's plantation by that day one week, to see to the weighing of the cotton. I told McM. of Duncan's request. I visited Duncan in March for the purpose of delivering to him a note on B. Little & Co. in part payment of the cotton referred to. He took the note from me and saw Judge Munger, I think. and finding out that he could not use the note as he thought he could, when he agreed to take it from McMahan, he returned it to me the same day. I do not know who has the note. The note was presented to Duncan and returned to me on the same day, sometime in March last. I returned it to McMahan immediately on my return. I have never seen it since. The ownership of the note I do not know anything about.

Defendant then introduced Beeks, who testified that he resided with the defendant the year 1855 in Austin county ; that Walter Andrews came to defendant's house some two or three

times in the Spring of that year ; was there, he thinks, in March; and once after the cotton was taken off by defendant to Houston ; that all the cotton was hauled off about the 25th of April, 1855, but five bales, and all at once ; that the five bales were hauled off a few days after ; that the cotton could not have been taken down the Brazos river that Spring ; that no boat went down on account of low water ; that Myers did not, nor did any other person come to haul off the cotton for plaintiff ; that he thinks there were about forty-two bales, that averaged about 550 pounds each, but would not be certain as to weights; that he did not weigh all the bales.

A witness for defendant testified that, sometime in April, he hauled a load of cotton for defendant to Houston at 75 cents per hundred pounds, and that was then the price of hauling from this county to Houston.

Atkinson testified that he believed the price of hauling from this county to Houston, in April, 1855, was fifty cents per hundred lbs., but was not then engaged in hauling.

The Court instructed the jury, without request, as follows :

Where parties contract to do anything, as in this case, to deliver cotton, without fixing any particular time for the performance of the contract, the law intends that the contract shall be performed within a reasonable time under all the circumstances of the case, and what is a reasonable time is a question of law. Under the circumstances of this case the failure of the plaintiff to remove the cotton, before the month of April, 1855, was not such a delay as entitled or authorized the defendant to consider the contract at an end and to re-sell the cotton.

The measure of damages for the failure to deliver chattels, such as cotton, for instance, is the difference between the price which it was agreed should be paid, and the value of the article at the time it should have been delivered in accordance with the contract.

In inquiring into the price of the cotton, at the time it should

have been delivered, the jury will be guided by the evidence of the value of the cotton on the Brazos river at the time when it should have been deliverad, if the evidence is satisfactory on that point. If the jury have to resort to the prices of cotton in Houston to ascertain what this cotton was worth when it should have been delivered, the defendant is entitled to have the cost of transporting the cotton from the Brazos to Houston deducted from the Houston price.

If the jury believe from the evidence that the plaintiff contracted with the defendant for cotton of a grade known as "strict middling," or "good middling," then, the inquiry for the jury, in order to ascertain the measure of the damage sustained by the plaintiff, if he has sustained any, is the difference between the price agreed on, and the value of cotton of the same grade as that contracted for, at the time that it ought to have been delivered.

The following instructions were asked by the defendant and refused :

If no place be agreed on by the parties in the contract of sale of personal property, then the residence of the vendor is the place of delivery, especially in respect to cotton sold.

That if no time was fixed on for the delivery of the cotton, then it was to be delivered in a reasonable time under all the circumstances of the case.

That if the plaintiff, by his agent, agreed with defendant on a time and place of delivery, then that became the time and place of delivery.

If the time and place of delivery were fixed on, and the plaintiff were to appear in person, or by agent, and supervise the weighing of the cotton, at the time and place fixed, and the plaintiff failed so to appear at the time and place, then the defendant had a right to consider the contract at an end, and so treat it, and you should find for the defendant.

If the cotton on the day of delivery were worth, at the place of delivery, no more than plaintiff was to pay for it, then he

has sustained no loss, there being no allegation of fraud com-. mitted by the defendant, in misrepresenting the quality of the cotton to plaintiff at the time of the sale. It therefore is not material as to the character, quality or grade of the cotton sold. The inquiry for the jury is as to the difference in the agreed price of the cotton and its value on the day of delivery.

·Verdict and judgment for plaintiff for $220. Motion for new trial overruled, &c.

*G. W. Smith*, for appellant. At the making of the contract, by Duncan and McMahan, it appears to have expected that a steamboat would be down the river in a short time, upon which the cotton would.be placed and sent down to Richmond. Neither of the parties expected or anticipated the difficulties and delay there were in the navigation of the Brazos river. This contract was made 12th of February, 1855; the cotton to be sent by the first boat (perhaps it was expected by them) in a few days; but it appears no boat was able, on account of low water, to get down the river that Spring. The parties meeting with this unexpected delay, fixed on a time, when the cotton should be weighed and sent off for sale; this was to be the next week after Andrews was at the house of Duncan as agent of McMahan, which he stated was between the 3d and 10th of April, 1855.

Duncan held on to the cotton until after the 25th of April, 1855, waiting for McMahan, who fails to send up, weigh and receive the cotton. This delay and inattention on the part of McMahan, after the contract had been so long made, (two and a half months) when connected with the facts, that he had failed to pay off the account of T. H. McMahan & Co., as he contracted to do, but exacted the money on it of Duncan, would seem to exonerate Duncan from this contract of sale, so as to enable him to sell the cotton to others that would pay him. Is it to be contended that a party may make such a con-

tract, pay nothing on it, use little or no exertion to comply with its terms on his part, and yet hold the other party bound to an indefinite period of time?

The realising the proceeds of the cotton may have been a matter of urgent importance with Duncan, and if so the continuous delays and inattention of McMahan were calculated to injure him very much. And how long it would have been before he would have sent for the cotton is a matter of conjecture; but judging the future by the past, Duncan might have reasonably concluded that he would hardly come at all. He was running no hazard, he had paid nothing, and could safely postpone the matter; but Duncan's condition was different. He had already been kept out of the money for the cotton something like two and a half months; the cotton on his hands, at his risk, liable to be destroyed by fire or other casualties.

The reasonableness of time of performance in this case was a question for the jury, not for the Court. (16 Maine, 164; 24 Maine, 131; 3 Sumner, 530; 15 Maine, 350.)

*Hunt & Holland*, for appellee.

WHEELER, J. The witnesses estimated differently the quantity of the cotton, its value and price at the place of delivery, and the cost of its transportation thence to Houston. The jury had a right to adopt the estimate which they deemed nearest the truth; and they probably estimated the quantity at forty-four bales, weighing five hundred pounds each; the price contracted to be paid for it, five and three-fourth cents per pound; the cost of transportation to Houston one-half a cent; and its value in Houston at what it is proved to have been actually sold for there, viz.: seven and one-fourth cents. These estimates make the difference between the price at which the plaintiff purchased, and that which the defendant

afterwards sold, (which was the lowest estimate of value the jury were warranted in finding,) the precise amount of the verdict. That the plaintiff was entitled to recover that amount does not admit of question. It might be a question whether he was not entitled to recover more ; whether, where there has been a sale of cotton, even without any stipulation (and the petition alleges none) as to quality, it is not to be taken that an average quality is intended ; and whether, therefore, the plaintiff ought not to have been allowed by the verdict, the difference between the contract price, and the value of so much cotton of an average, instead of an inferior quality, at the time and place of delivery. If there was any error in the verdict it was in favor of the defendant. It evidently was not affected by any of the rulings of the Court of which he complains ; and there is no error in those rulings, in any matter material to the case. The alleged delay of the plaintiff in taking away the cotton, appears to have been a mere pretence, set up by the defendant to justify him in taking and disposing of it for a higher price, when it had risen in value in the market. He had no reason to doubt that the plaintiff would take it away and pay for it according to his contract. He was apprised that he need not wait for his pay until the plaintiff had shipped the cotton, but could have it whenever he required it. The bargain was completely closed; the cotton was baled and on the spot where it was to have been delivered ; and the defendant was at liberty to call for his pay whenever he chose, but the price having arisen in the market, he sent it away and disposed of it, in violation of his contract with the plaintiff. The instructions asked by the defendant had no application to such a state of case, and were rightly refused. As applied to the evidence, there was no error in the charge of the Court. There was no default or delay on the part of the plaintiff, as respected the performance of the contract on his part ; and it is wholly immaterial, therefore, whether what would be a reasonable time for the performance of such a contract, be a question of

law for the Court, or a mixed question of law and fact for the jury to decide under the instructions of the Court. The question did not arise in the case.

There is no reason to suppose that the jury took into consideration the quality of the cotton; and if there was error in the charge as to the right of the jury to consider the quality of the cotton in estimating the damages—which I apprehend there was not—it manifestly had no influence upon the verdict, and would afford no ground for reversing the judgment.

There is no error in the judgment, and it is affirmed.

Judgment affirmed.